

U.S. DISTRICT COURT
EASTERN DISTRICT-WI

UNITED STATES DISTRICT COURT        FILED
EASTERN DISTRICT OF WISCONSIN

'10   OCT -5   AM 49

UNITED STATES OF AMERICA,

              Plaintiff,

JON W. SANFILIPPO
CLERK

       v.

Case No. 10-CR-103 (RTR)

RAMON TRINIDAD,

              Defendant.

---

## PLEA AGREEMENT

---

1.      The United States of America, by its attorneys, James L. Santelle, United States Attorney for the Eastern District of Wisconsin, and Elizabeth Blackwood, Assistant United States Attorney, and the defendant, Ramon Trinidad, individually and by Attorney Martin Pruhs, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.      The defendant has been charged in a four-count indictment, which alleges violations of Title18, United States Code, Sections 2113(d), 922(g), 924(c), and 2.

3.      The defendant has read and fully understands the charges contained in the indictment. He fully understands the nature and elements of the crimes with which he has been charged, and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.      The defendant voluntarily agrees to plead guilty to the following counts set forth in full as follows:

## COUNT ONE

THE GRAND JURY CHARGES THAT:

On or about April 20, 2010, in the State and Eastern District of Wisconsin,

**RAMON R. TRINIDAD, aka Pepito, and
LUIS M. RAMOS,**

by force, violence, and intimidation, did take from the presence of tellers approximately $5,573

belonging to and in the care, custody, control, management, and possession of the Guaranty Bank,

Greenfield, Wisconsin, a financial institution, the deposits of which were then insured by the Federal

Deposit Insurance Corporation, and in committing this offense, did put in jeopardy the life of the

tellers by the use of a dangerous weapon, to wit: a handgun.

All in violation of Title 18, United States Code, Sections 2113(a) and (d) and 2.

## COUNT TWO

THE GRAND JURY FURTHER CHARGES THAT:

On or about April 20, 2010, in the State and Eastern District of Wisconsin,

**RAMON R. TRINIDAD, aka Pepito, and
LUIS M. RAMOS,**

knowingly used and brandished a firearm during and in relation to the crime of violence charged in

Count One of this indictment.

All in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii) and 2.

2

**COUNT THREE**

THE GRAND JURY FURTHER CHARGES THAT:

On or about April 20, 2010, in the State and Eastern District of Wisconsin,

**RAMON R. TRINIDAD, aka Pepito,** and
**LUIS M. RAMOS,**

by force, violence, and intimidation, did take from the presence of tellers approximately $15,438

belonging to and in the care, custody, control, management, and possession of the Bank Mutual,

Milwaukee, Wisconsin, a financial institution, the deposits of which were then insured by the Federal

Deposit Insurance Corporation, and in committing this offense, did put in jeopardy the life of the

tellers by the use of a dangerous weapon, to wit: a handgun.

All in violation of Title 18, United States Code, Sections 2113(a) and (d) and 2.

5. The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the

offenses described in paragraph 4. The parties acknowledge and understand that if this case were

to proceed to trial, the government would be able to prove the facts set forth in Attachment A beyond

a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt

beyond a reasonable doubt. The information in Attachment A is provided for the purpose of setting

forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of,

or participation in, these offenses.

**PENALTIES**

6. The parties understand and agree that the two counts of Armed Bank Robbery to

which the defendant will enter a plea of guilty each carry the following maximum terms of

imprisonment and fines: 25 years and $250,000. Using a Firearm in Furtherance of a Crime of

3

Violence carries the following maximum term of imprisonment and fine: Life in prison and $250,000. This charge also carries a mandatory minimum sentence of seven (7) years, and the sentence must run consecutive to any other sentence. Each count also carries a mandatory special assessment of $100.00, and up to 5 years of supervised release. The parties further recognize that a restitution order will be entered by the court.

7.  The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney, including any possibility that the defendant may qualify as a career offender under the sentencing guidelines.

## ELEMENTS

8.  The parties understand and agree that in order to sustain the charge of Armed Bank Robbery as set forth in Counts One and Three, the government must prove each of the following propositions beyond a reasonable doubt:

(1)  The defendant took from the person or presence of another money belonging to or in the care, custody, control, management, or possession of the bank;

(2)  At the time, the deposits of the bank were insured by the Federal Deposit Insurance Corporation;

(3)  The defendant acted to take such money by force and violence, or by intimidation; and,

(4)  The defendant put in jeopardy the life of the teller by the use of a dangerous weapon.

The parties understand and agree that in order to sustain the charge of Using a Firearm in Furtherance of a Crime of Violence as set forth in Count Two, the government must prove each of the following propositions beyond a reasonable doubt:

(1)  that the defendant committed the crime charged in count one of the indictment; and,

4

(2)     that he knowingly used and brandished a firearm in furtherance of that crime.

## DISMISSAL OF REMAINING COUNT

9.     The government agrees to move to dismiss Count Four of the indictment at the time of sentencing.

## SENTENCING PROVISIONS

10.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offenses set forth in paragraph 4. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

5

## Sentencing Guidelines Calculations

14.     The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

15.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offenses to which the defendant is pleading guilty.

## Base Offense Level

16.     The parties agree to recommend to the sentencing court that the applicable base offense level for the offenses charged in Count One and Three is 20 under Sentencing Guidelines Manual § 2B3.1.

## Financial Institution

17.     The parties agree to recommend to the sentencing court that a two-level increase under Sentencing Guidelines Manual § 2B3.1(b)(1) is applicable to the offense level for the offenses charged in Count One and Three, because the money taken was the property of a financial institution.

6

### Firearm

18.     The parties agree to recommend to the sentencing court a six-level increase under Sentencing Guidelines Manual § 2B3.1(b)(2)(B) is applicable to the offense level for the offense charged in Count Three because a firearm was pointed at a teller.

### Amount of Loss

19.     The parties agree to recommend to the sentencing court a one-level increase under Sentencing Guidelines Manual § 2B3.1(b)(7)(B) is applicable to the offense level for the offense charged in Count Three because the loss exceeded $10,000.

### Role in the Offense

20.     Pursuant to Sentencing Guidelines Manual § 3B1.1 and § 3B1.2, the parties agree to recommend that no adjustment be given for an aggravating or mitigating role in the offense, as the defendant was neither an organizer, leader, manager, or supervisor, nor a minimal or minor participant.

### Combined Offense Level

21.     The parties agree to recommend to the sentencing court that pursuant to Sentencing Guidelines Manual § 3D1.4, the combined offense level for the offenses charged in Counts One and Three is 30.

### Acceptance of Responsibility

22.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a),

7

the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

**Sentencing Recommendations**

23. Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

24. Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

25. The parties agree to recommend a sentence within the applicable sentencing guideline range, as determined by the Court, and to recommend that the entire sentence run consecutive to any other sentence the defendant is serving at the time of sentencing.

**Court's Determinations at Sentencing**

26. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

8

27. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

28. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable upon entry of the judgment of conviction. The defendant agrees not to request any delay or stay in payment of any and all financial obligations.

29. The defendant agrees that, during the period of any supervision (probation or supervised release) imposed by the court in this case, the defendant will provide the Financial Litigation Unit (FLU) of the United States Attorney's Office with completed financial forms which will be provided by FLU, and will provide any documentation required by those forms. The defendant will provide FLU with such completed financial forms with required documentation within the first two months of supervision, at six month intervals thereafter during supervision, and within the last six months of scheduled supervision.

### Special Assessment

30. The defendant agrees to pay the special assessment in the amount of $300 prior to or at the time of sentencing.

### Restitution

31. The agrees to pay restitution, jointly and severally with any other individual ordered to pay restitution for the same offense(s), to the Guaranty Bank in the amount of approximately $5,573, and to Bank Mutual in the amount of approximately $15,438. The defendant understands that because restitution for the offenses is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources. The defendant agrees to cooperate in

9

efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

## DEFENDANT'S COOPERATION

32. The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so. The government agrees to advise the sentencing judge of the nature and extent of the defendant's cooperation. The parties acknowledge, understand and agree that if the defendant provides substantial assistance to the government in the investigation or prosecution of others, the government, in its discretion, may recommend a downward departure from: (a) the applicable sentencing guideline range; (b) any applicable statutory mandatory minimum; or (c) both. The defendant acknowledges and understands that the court will make its own determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

## DEFENDANT'S WAIVER OF RIGHTS

33. In entering this agreement, the defendant acknowledges and understands that in so doing he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

    a. If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

    b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who

10

the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

34. The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

35. The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but

11

not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

36. The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

## GENERAL MATTERS

37. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

38. The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

39. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

40. The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

12

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

41.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government.  The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter.  If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement.  The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement.  The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing.  If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

42.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty.  The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

13

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: **4-10-2010**                    _R. Trinidad_
RAMON TRINIDAD
Defendant


I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 10/5/10                    _M. J. Pm_
MARTIN PRUHS
Attorney for Defendant


For the United States of America:

Date: 10/5/10                    _James Santelle_
JAMES SANTELLE
United States Attorney


Date: 10/5/10                    _Elizabeth Blackwood_
ELIZABETH BLACKWOOD
Assistant United States Attorney


14

## Attachment A
### (*United States v. Ramon Trinidad*)

**Armed Robbery of the Guaranty Bank** (Counts One and Two)

Citizen Witness K.G. reported that he was a customer at the Guaranty Bank in Greenfield, Wisconsin, on April 20, 2010, at around 12:00 noon. K.G. was at a teller window attempting to cash a check when an individual approached him from behind and put a gun to the back of his neck. At the same time he made K.G. hold a bag which he described as being a tan colored pillowcase, and ordered the teller to put money in the bag. K.G. stated that this individual was taller than himself and that he (K.G.) is approximately 6'0" tall. K.G. stated that his wallet was on the counter at the time of the robbery and the individual with the gun to his neck eventually took his wallet as well. K.G. stated that he observed a second individual in the bank who was also participating in the robbery. K.G. described this second individual as being approximately 5'8" tall, armed with a handgun and wearing a white skeleton type of mask over his face. This second individual went into one of the bank's offices and held a gun to the head of a bank employee. K.G. stated that after the bank teller had put money into the bag that he was forced to hold, the first individual took the bag from him and both of the individuals ran out of the bank. They fled in a Jeep Cherokee that had been stolen earlier that day.

Citizen Witness W.S. reported that he was employed as the manager of the above mentioned Guaranty Bank. At the time of the robbery, W.S. was inside of his office when he heard some loud noises coming from the lobby. W.S. looked up and saw an individual who appeared to be approximately 6'0" to 6'3" tall holding a gun to the back of a customer's head. At around the same time, a second individual walked from behind the first individual and immediately came into W.S.'s office. W.S. observed that this second individual was shorter then the first, about 5'8" and had a thinner build. This second individual put a gun to the back of W.S.'s head and stated words to the effect, "Do you have any money, don't pull any alarms, don't do anything stupid." W.S. described this second individual as wearing a white colored Halloween costume which covered his face. W.S. did not provide any money to the second individual who along with the first individual ran out of the bank, at which time W.S. called 911.

Citizen Witness T.D. reported that she was employed by the above mentioned Guaranty Bank at the time of the robbery and that she was at the teller window assisting a customer when the robbery suspects entered the bank. One of these individuals came to her window and put a gun to the back of the head of the customer she was assisting. This individual demanded that she empty her drawers, and threatened to shoot her. T.D. stated that she removed U.S. currency from her drawer and placed it into a tan pillowcase that the robbery suspect had brought into the bank.

An audit was conducted by Guaranty Bank personnel and revealed that approximately **$5,573** in U.S. currency was stolen. The funds of the Guaranty Bank are insured by the Federal Deposit Insurance Corporation.

15

### Armed Robbery of the Bank Mutual (Count Three)

Citizen Witness A.H. reported that she was employed at the Bank Mutual in Milwaukee, Wisconsin, on April 20, 2010. At approximately 3:14 p.m., she was working at a teller window when she observed two individuals enter the bank with handguns. A.H. described one of the individuals as being approximately 6"0" to 6'3" tall and wearing a dark hooded sweatshirt. This individual approached other tellers in the bank yelling words to the effect, "Hurry up, hurry the fuck up, fill the bag up, put money in the bag." The second individual approached her teller window. A.H. described this second individual as being approximately 5'3" to 5'6" tall and having a thin build. This second individual was wearing a hooded sweatshirt which had a white skeleton design on it. This second individual pointed a gun at her and handed her a beige colored pillowcase and demanded that she fill it up. A.H. stated that she took U.S. currency from her drawer and placed it into the pillowcase. A.H. also placed a dye pack into the pillowcase. After handing the pillowcase back to the second individual, he stepped away, told her to keep her hands up, and eventually ran out of the bank with the first individual.

Citizen Witness J.P. reported that she was employed at the above mentioned Bank Mutual. At the time of the robbery, she was working at a teller window when two armed individuals entered the bank. J.P. stated that one of the individuals was wearing a hooded sweatshirt with a skeleton design on it. This individual approached another teller with a handgun in his hand and gave the teller a tan pillowcase and demanded that she fill it up. At the same time, the other individual who was wearing a dark hooded sweatshirt, came over to another teller window also making demands for cash stating word to the effect, "What the fuck is going on, hurry up." After obtaining U.S. currency from most of the tellers, the two individuals left the bank and went towards the bank parking lot and get into a blue colored vehicle.

Citizen Witness A.M. reported that she was working at the above mentioned Bank Mutual. At the time of the robbery, A.M. was assisting a customer when she noticed two individuals come into the bank. One of the individuals, who was armed with a dark colored handgun, approached A.M.'s teller window. A.M. described this individual as being a Hispanic male approximately 6'2" to 6'3" tall and wearing a black hooded sweatshirt. This individual handed A.M. a bag and told her to fill it up. Fearing for her safety, A.M. placed U.S. currency into the bag as well as placing a dye pack into the bag. At one point during the robbery, A.M. heard both of the individuals speaking Spanish to each other.

An audit was conducted by Bank Mutual personnel and revealed that approximately **$15,438** in U.S. currency was stolen. The funds of Bank Mutual are insured by the Federal Deposit Insurance Corporation.

The vehicle used as the getaway in the second robbery was stolen in the early afternoon. About 4:30 p.m., the owner spotted the vehicle, and saw two individuals, consistent with the description of the robbers, exit the vehicle, and enter a house. Right after he exited, the one with the skeleton sweatshirt (RAMOS) threw something into the car. Moments later, the vehicle was engulfed in flames.

16

On April 28, 2010, after being advised of his Constitutional Rights per *Miranda*, TRINIDAD admitted to his involvement in the robbery of the Guaranty Bank on 04/20/2010. At the time of the interview, TRINIDAD declined to provide the identify second actor in that robbery. He did not acknowledge participating in the Bank Mutual robbery.

On April 29, 2010, an in person lineup was conducted at the Milwaukee Police Department Police Administration Building, which included TRINIDAD. Two of the three victims from the Guaranty Bank robbery positively identified TRINIDAD in the surveillance as being one of the individuals who robbed the bank. All five of the victims in the Bank Mutual robbery identified TRINIDAD as being the one of the individuals who robbed the bank.

Subsequent information obtained by the Milwaukee Police Department led to the identification of LUIS RAMOS as being the second individual being involved in the above mentioned robberies. RAMOS is a Hispanic male, approximately 5'6" tall and weighing approximately 120 pounds. RAMOS was subsequently arrested by the Milwaukee Police Department based upon him violating his conditions of State parole. On May 1, 2010, after being advised of his Constitutional Rights per *Miranda*, RAMOS admitted to his involvement in both the robbery of the Guaranty Bank and Bank Mutual, both of which took place on April 20, 2010. RAMOS stated that he robbed these banks with TRINIDAD. RAMOS stated that both he and TRINIDAD were armed with handguns at the time of both of these robberies.

17